**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **WILLIAM R. WEHRS, JR.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | Case No. 07 C 3312 |
| ) | |
| **BENSON YORK GROUP, INC., NEW** ) | Judge Joan H. Lefkow |
| **CASTLE FINANCIAL SERVICES, LLC,** ) | |
| **KEVIN BRENNAN, and KEVIN WELLS,** ) | |
| ) | |
| **Defendants.** ) | |

**OPINION AND ORDER**

On June 14, 2007, plaintiff Williams R. Wehrs, Jr. filed a complaint seeking damages from his former securities broker, Benson York Group, Inc., Benson York employees Kevin Brennan and Kevin Wells, and New Castle Financial Services, LLC, the corporation formed subsequent to Benson York's dissolution.[1] The complaint alleged that Benson York, New Castle, Brennan and Wells are liable for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), codified at 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as common law negligence, fraud, and breach of fiduciary duty. After Wells and the other named defendants failed to appear, answer, or otherwise plead to the complaint, the court on September 14, 2009 entered a default judgment against them. The court later vacated the judgment against defendants New Castle and Brennan, and those parties eventually settled with Wehrs. Wells's motion to vacate was denied as to

---

[1] The complaint also named North American Clearing, Inc. as a defendant. North American was dismissed on March 19, 2008. Dkt. No. 41.

liability but granted on the issue of damages, which is now before the court on Wehrs's motion for summary judgment. For the reasons stated below, Wehrs's motion [#153] is granted.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the nonmoving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## FACTS

To the extent the facts stated in the submissions on the motion are undisputed, yet inconsistent with allegations of the complaint, the court accepts the submissions on the motion. Otherwise, the consequential admissions of fact are the facts alleged in Wehrs's original

complaint, as default was entered for failure to plead to that version of the complaint. The court has also considered the facts sworn to in Wehrs's first affidavit submitted in support of the default judgment. *See* Dkt. No. 64.

I.   **The Purchase and Sale of CYBX Shares**

Wells is a stockbroker who was employed by Benson York (now New Castle) from 2004 to 2006. Wehrs was Wells's client. On June 23, 2005, Wehrs, pursuant to Wells's recommendation, placed an order for 4,000 shares of Cyberonics, Inc. ("CYBX"), on margin,[2] at a price of $43.75 per share.[3] Wehrs placed a $7,500 stop loss on the order. The stop loss would limit the amount of any loss to Wehrs's account to no more than $7,500.[4]

---

[2] When an investor purchases stock on margin, he borrows a portion of the cash that is required to make the purchase by using his own investment as collateral. *See* Securities and Exchange Commission, *Investor Tips: Margin – Borrowing Money To Pay for Stocks*, http://www.sec.gov/investor/pubs/margin.htm (referred to herein as "Margin Investor Tips").

[3] Wells asserts that he was directed to purchase 4100 shares of CYBX. *See* Wells Aff. ¶ 5; Wells's Verified Answer to Second Amended Compl. (hereinafter "Verified Answer") ¶ 11. Given the default that was entered against Wells, the court must accept the well-pleaded allegations in Wehrs's complaint. *See Black* v. *Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied."). The complaint asserts that Wells was only directed to purchase 4000 shares.

[4] The parties agree that Wells placed a "$7,500 stop loss" on the order and that the stop loss would limit Wehrs's losses to $7,500. *See* Compl. ¶ 9; Wells Aff. ¶ 5; Verified Answer ¶¶ 11, 12. Usually, a "stop-loss order" refers not to the total amount of money that may be lost but rather to the "stop price" at which a broker is instructed to place a market order to sell the stock. *See* Securities and Exchange Commission, *Stop Order*, http://www.sec.gov/answers/stopord.htm. The stock will then be sold at the best available price. *Id.*; *see also* Securities and Exchange Commission, *Market Order*, http://www.sec.gov/answers/mktord.htm. The price at which a market order will be executed cannot be guaranteed: if the market is moving rapidly, the execution price may be significantly lower than the stop price. *See* Securities and Exchange Commission, Office of Investor Education and Advocacy, *Investor Bulletin: Trading Basics* (Mar. 2011), *available at* http://www.sec.gov/investor/alerts/trading101basics.pdf; Mary Pilon, Karen Blumenthal & Jason Zweig, *When 'Stop Loss' Trades Backfire on Investors*, WALL ST. J., May 15, 2010. Therefore usually an investor has no guarantee as to the total amount of money that may be lost. For the purpose of resolving the pending motion, however, the court accepts the parties' assertions that Wells agreed to limit the losses on Wehrs's account to $7,500.

On June 24, 2005, Wells purchased for Wehrs's account 4,100 shares of CYBX on margin at a market price of $46.99 per share, for a total purchase price of $192,659. Wells charged Wehrs a commission of $2.33 per share. The total amount charged to Wehrs's account, including commissions, was $202,215.[5]

On June 27, 2005, Wells sold the stock for $44.33 per share. Wehrs was charged a $100 commission. Wehrs's account was credited $181,650.[6] According to the complaint, this sale was made without authorization from Wehrs. Wells, however, testifies that the shares were sold automatically pursuant to the stop loss.

Later that day, Wells repurchased 4,100 shares of CYBX on margin for the same price of $44.33 per share. Wehrs was charged a commission of $2.19 per share. The total amount charged to Wehrs's account was $190,735.[7] The complaint alleges that Wehrs did not authorize this transaction.[8]

The complaint alleges that, once Wehrs learned of the purchase and repurchase of the CYBX stock, Wehrs immediately attempted to contact Wells and Brennan. Compl. ¶ 14. Wehrs left telephone messages for Wells that were not returned. *Id.* On July 15, 2005, Wehrs and Wells spoke on the phone. *Id.* Wells told Wehrs that any losses to the account would be

---

[5] There is a $3 difference between the sum of the purchase price and commission charge (which equals $202,212) and the amount charged to Wehrs's account. *See* Wells Ex. A at 3.

[6] There is a $3 difference between the amount credited to Wehrs's account and the purchase price minus the commission charge. *See* Wells Ex. A at 3.

[7] As with the other transactions, there is a $3 difference between the amount charged to Wehrs's account and the sum of the purchase price and commission charge.

[8] Wells asserts that Wehrs called him after the CYBX stock was sold and directed him to repurchase the stock without a stop loss. Wells Aff. ¶ 5; Verified Answer ¶ 15. Wells's default precludes him from contesting Wehrs's well-pleaded allegation that the repurchase was unauthorized.

reversed on July 18, 2005, because CYBX had received FDA approval for its product and the stock would rise to $65 per share as a result. *Id.*

CYBX did not increase in value on July 18 or thereafter. Rather, it began to decline in price and was sold pursuant to margin calls.[9] The complaint alleges that Wehrs then "engaged in a series of communications with [Benson York], Wells, and Brennan, regarding the losses suffered." *Id.* ¶ 16. Wells and Brennan told Wehrs that the commissions charged to his account in connection with the purchase and re-purchase of CYBX would be reversed, that any stock sold on margin would be repurchased for Wehrs's account, and that CYBX would eventually increase in value. *Id.* ¶ 18. Wehrs alleges that whenever he "contacted Wells or Brennan . . . to sell the stock, [Wells and Brennan] provided promises and representations to make [Wehrs] whole for his losses." *Id.* ¶ 21.

Wells attests that Wehrs never directed or authorized him to sell any stock after June 27, 2005. He asserts that "control of Wehrs' account was taken from me by Benson York's supervisor Kevin Brennan on August 17, 2005 based on Wehrs' complaints to him." Wells Aff. ¶ 11. Wells claims that he had "no ability" to sell Wehrs's stock after Brennan took control of the account and that he had no further communications with Wehrs after this happened. *Id.*[10]

---

[9] If an investor's equity in his account falls below a certain required maintenance margin (such as 50%), the broker issues a "margin call," which requires the investor to either liquidate some of his stock or add cash to his account. If the investor does not answer a margin call, the broker has the right to sell his securities until the account reaches the maintenance margin. *See* Margin Investor Tips.

[10] Wehrs does not contest these assertions in a counter-affidavit but rather asserts that these facts go to Wells's liability and that this issue has already been resolved against Wells by default judgment.

5

On September 26, 2005, the commission that Wehrs had been charged in connection with the repurchase of CYBX stock was reversed. Wehrs received a credit of $8,979 to his account.[11] All but 85 shares of the CYBX stock were subsequently sold pursuant to margin calls. Wehrs's account was credited a total of $133,855 from the sales. On July 2, 2009, the last 85 shares were sold for $1,398.

## II.     Procedural History

The following procedural history is relevant to the court's consideration of Wehrs's motion. Wehrs filed suit against Wells, Brennan, Benson York, and New Castle on June 14, 2007. The case was stayed from May 30, 2008 to June 3, 2009. (The defendants appealed from the court's denial of their motion to compel arbitration but ultimately dismissed the appeal.) On August 13, 2009, defendants' attorney was granted leave to withdraw. After defendants failed to answer the complaint or appear in court, the court entered a default judgment against them based on the prove-up affidavit of Wehrs. Soon thereafter, New Castle and Brennan, by new counsel, filed motions to vacate. These motions were granted on November 17, 2009. On December 7, 2009, Wells, representing himself, filed his motion to vacate the default judgment. The court denied Wells's motion to vacate as to liability but permitted him to rebut the amount of damages claimed by Wehrs. Dkt. No. 101. The court specifically allowed plaintiff to rebut allegations that Wehrs's losses were in excess of $92,000.

Wehrs filed a first amended complaint on January 22, 2010 and a second amended complaint on July 22, 2010. Following the filing of the second amended complaint, the parties

---

[11] The complaint, at paragraph 28, alleges that defendants Benson, Wells and Brennan promised, among other things, that the commissions charged for the unauthorized purchase and re-purchase of the CYBX shares would be credited to Wehrs's account in the amount of $18,532. Paragraph 19 alleges defendants failed to fulfill this promise.

commenced settlement discussions. All defendants, including Wells, were present at these discussions. Brennan and New Castle settled Wehrs's claims for $27,499, and on October 15, 2010, they were dismissed with prejudice as defendants in this case. Dkt. No. 144. Wells was not able to reach an agreement with Wehrs. After newly retained counsel entered an appearance for Wells, the parties agreed to submit the issue of damages to the court by motion for summary judgment.

## ANALYSIS

### I. Scope of the Claims Under Consideration

A default judgment establishes, as a matter of law, that the defendant is liable to the plaintiff for each cause of action alleged in the complaint. *Breuer Elec. Mfg. Co.* v. *Toronado Sys. of Am., Inc.*, 687 F.2d 182, 186 (7th Cir. 1982). The facts alleged in the complaint in support of a cause of action may not later be contested by the defaulting party. *Black* v. *Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994); *Thomson* v. *Wooster*, 114 U.S. 104, 5 S. Ct. 788, 29 L. Ed. 105 (1885); *see also* Fed. R. Civ. P. 8(b)(6). Courts recognize, however, that "[j]udgment by default may be granted only for such relief as may lawfully be granted upon the well-pleaded facts of the complaint." *Taulton* v. *Wright*, No. 3:93-CV-520RM, 1995 WL 853119, at *2 (N.D. Ind. Aug. 2, 1995) (citation and quotation omitted). Therefore the entry of default judgment does not preclude the court from examining the sufficiency of the facts alleged in the complaint. *Black*, 22 F.3d at 1399; C. Wright, A. Miller, M. Kane, & R. Marcus, 10A *Federal Practice and Procedure* § 2688 ("[E]ven after default it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action . . . .").

This court granted judgment based on the admitted allegations of the complaint and a prove-up affidavit of Wehrs but did not specify which claims within the complaint were

7

established by Wehrs's undisputed averments. This was an incomplete disposition of the case, as the court should have determined which claims had been established. *See Black*, 22 F.3d at 1399; *Larance* v. *Bayh*, No. 3:94-cv-182RM, 1995 WL 46718, at *1 (N.D. Ind. Jan. 18, 1995). Moreover, that omission causes difficulty in resolution of the damages issues briefed by the parties because the measure of damages in federal securities fraud cases must be allocated among participants in the fraud. *See* Private Securities Litigation Reform Act of 1995, 15 U.S.C § 78u-4(f)(7)(B); *Laperriere* v. *Vesta Ins. Grp., Inc.*, 526 F.3d 715, 719–20 (11th Cir. 2008); *Ray* v. *Citigroup Global Markets, Inc.*, No. 03 C 3157, 2004 WL 1794927, at *1–4 (N.D. Ill. Aug. 4, 2004); Donald L. Langevoort, *The Reform of Joint and Several Liability Under the Private Securities Litigation Reform Act of 1995: Proportionate Liability, Contribution Rights and Settlement Effects*, 51 BUS. LAWYER 1157 (Aug. 1996). This is not true of the common law claims as awards of damages are typically joint and several against all wrongdoers.

It takes little examination to conclude that the well pleaded allegations of the original complaint, even as supplemented by Wehrs's affidavit, do not establish a claim for violation of § 10(b) or Rule 10b-5. To prove a violation, Wehrs must establish that Wells (1) made a false statement or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) on which Wehrs justifiably relied, and (6) that the false statement proximately caused Wehrs's damages. *See Caremark, Inc.* v. *Coram Healthcare Corp.,* 113 F.3d 645, 648 (7th Cir. 1997) (citations omitted). Here, the only statement Wehrs identifies that might have caused him damages is Wells's representation on July 15, 2005 that "any losses suffered in my account would be reversed on Monday, July 18, 2005, because CYBX had received FDA approval for its product, and the stock would rise to $65.00 per share on July 18, 2005." Compl. ¶ 14; Wehrs Aff. ¶ 5. Other allegations about promises made by Wells are general allegations

against all defendants and fail to specify the "who, what, when, where and how" of the fraud. Moreover, these representations pertained to unfulfilled promises by one or more defendants to give redress to Wehrs for the unauthorized transactions and were not a fraud in themselves. In any event, Wehrs does not allege that he took any action or failed to take action in reliance on Wells's representation. Thus, neither the complaint nor the prove-up affidavit supports the allegation of § 10(b) and Rule 10b-5 violations alleged. Unauthorized transactions may be unlawful under other sections of the securities laws, but this court is not in the business of searching for something Wehrs has not alleged. Wehrs's claim for common law fraud also fails for failure to plead the requisite facts with sufficient particularity as to Wells.

The allegations in Wehrs's complaint appear to support common law claims for breach of fiduciary duty and negligence. A "securities broker is a broker employed to buy or sell securities *for a customer*, and therefore the broker is the customer's agent. Because the broker is the agent and the customer is the principal, they are in a fiduciary relationship as a matter of law." *Khan* v. *BDO Seidman, LLP,* 948 N.E.2d 132, 157, 408 Ill. App. 3d 564, 350 Ill. Dec. 63 (2011) (internal citations and quotation marks omitted).[12] The duty of care owed by a broker carrying a nondiscretionary account for a customer is an "exceedingly narrow one, consisting at most of a

---

[12] Neither party addresses choice of law issues with respect to Wehrs's state law claims. Federal courts, reasoning by analogy to diversity cases, apply the choice of law rules of the forum state to supplemental state law claims. *Baltimore Orioles, Inc.* v. *Major League Baseball Players Ass'n*, 805 F.2d 663, 681 (7th Cir. 1986). Under Illinois law, a choice of law analysis is only required if there is a conflict of laws and the difference will affect the outcome of the case. *Townsend* v. *Sears, Roebuck & Co.*, 879 N.E.2d 893, 899, 227 Ill. 2d 147, 316 Ill. Dec. 505 (2007). Here, the actions complained of occurred in New York, and Benson York was a New York corporation. Under New York law, as in Illinois, a securities broker has a limited fiduciary duty to notify the customer before making sales and to execute requested trades. *See Indep. Order of Foresters* v. *Donald, Lufkin & Genrette, Inc.*, 157 F.3d 933, 940–41 (2d Cir. 1998). The elements for a cause of action for breach of fiduciary duty are also the same under both New York and Illinois law. *Compare Meisel* v. *Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009), *with Autotech Tech. Ltd. P'ship* v. *Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006). Because there is no conflict of laws, the court applies Illinois law to Wehrs's claims.

duty to properly carry out transactions ordered by the customer." *Index Futures Grp., Inc.* v. *Ross*, 557 N.E.2d 344, 348, 199 Ill. App. 3d 468, 145 Ill. Dec. 574 (1990). The Second Circuit has concluded that this means that, "[o]n a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale." *de Kwiatowksi* v. *Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1302 (2d Cir. 2002); *accord Khan*, 948 N.E.2d at 151; *see also Anspacher & Assocs., Inc.* v. *Henderson*, 854 F.2d 941, 945 (7th Cir. 1988).[13] Failure to execute a customer's order faithfully, provide competent advice regarding a transaction, or notify the customer of a sale would undoubtedly be a breach of that duty. The same principles can be applied to a claim for negligence against a securities broker. *See Ross*, 557 N.E.2d at 348; *de Kwiatowksi*, 306 F.3d at 1303–07. The facts alleged in the complaint would establish that Wells breached a duty owed to Wehrs by failing to faithfully execute the first purchase order, failing to execute the $7,500 stop loss order, and repurchasing the stock without Wehrs's authorization. Therefore Wells can be liable for damages that were the proximate result of these actions.

Because the court's original jurisdiction derived from Wehrs's Exchange Act claims, the court must also consider whether it is proper to retain jurisdiction over the supplemental state law claims given that the federal claims fail on the face of the complaint. *See Groce* v. *Eli Lilly & Co.*, 193 F.3d 496, 500 (7th Cir. 1999). In doing so, the court analyzes the factors set forth in 28 U.S.C. § 1367(c) and whether "the values of judicial economy, convenience, fairness, and comity" provide a basis for retaining jurisdiction. *Id.* (quoting *City of Chicago* v. *Int'l Coll. of Surgeons*, 522 U.S. 156, 173, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997)); *Brazinski* v. *Amoco*

---

[13] On the other hand, a broker does not have a general fiduciary duty to provide ongoing advice. *Khan*, 948 N.E.2d 132.

*Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993). Wehrs's common law claims do not raise novel or complex issues of state law. *See* 28 U.S.C. § 1367(c)(1). Nor do they "substantially predominate" over the federal securities claims. *See id.* § 1367(c)(2). Moreover, the court and the parties have already invested significant time and resources into this case and, given that the only remaining issue to be decided is damages, it would be inefficient to return the case to state court. Taking the foregoing into account, judicial economy and fairness are best served by retaining jurisdiction over Werhs's state law claims.

**II.     Calculation of Damages**

The measure of damages for Wehrs's claims for breach of fiduciary duty and negligence is to restore him to the position he would have been in had the breach of the applicable standard of care not occurred. *See Restatement (Second) of Torts* § 874 (2d ed. 1979). "Although upon default the factual allegations of a complaint relating to liability are taken as true, allegations in a complaint relating to the amount of damages suffered ordinarily are not." *United States* v. *Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989); *Dimmitt & Owens Fin., Inc.* v. *United States*, 787 F.2d 1186, 1189 (7th Cir. 1986); Fed. R. Civ. P. 8(b)(6). The defaulting party may also raise the issue of proximate cause as it relates to the calculation of damages. Robert M. Bloom, 10 *Moore's Federal Practice* § 55.32[c] (discussing *Trans World Airlines, Inc.* v. *Hughes*, 449 F.2d 51, 70 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973)). The defaulting party may not, however, dispute that proximate cause has already been established with respect to liability. *Greyhound Exhibitgroup* v. *E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992); *see also Trans World Airlines*, 449 F.2d at 70. Judgment by default may be entered without a hearing if the damages can be determined from definite figures contained in detailed affidavits or other

documentary evidence. *Dundee Cement Co.* v. *Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983).

Wehrs asserts that he suffered a loss of $97,445 as a result of Wells's conduct. This is equal to the total loss from the first sale of CYBX plus the losses that resulted from the later sales on margin call. Wehrs asserts that Wells is entitled to a credit of $8,979, the value of one of the commissions that was refunded to Wehrs's account, plus $1,398, the amount Wehrs received from the sale of the final 85 shares. Wehrs calculates that his total loss after credits is $87,068, and then subtracts the amount already paid by the settling defendants. Wehrs's calculation does not take into account that Wehrs directed Wells to purchase a certain amount of CYBX on June 23, 2005, however. It also fails to consider the $7,500 stop loss. Moreover, neither party has cited any cases that address damages for breach of fiduciary duty or negligence in a factual situation analogous to the one presented here.

This leaves the court in the awkward position of calculating damages in an area in which it has no guidance. Thus, the court will enter judgment in favor of Wehrs and against Wells as set out below. If either party wishes to move under Rule 59(e) to alter or amend the judgment, he may do so. Any such motion must be based on a rationale that is consistent with the court's ruling on the scope of the facts and legal claims under consideration.

A.      **Damages Resulting from the Purchase and Sale of CYBX**

On June 23, 2005, Wehrs directed Wells to purchase 4000 shares of CYBX at $43.75 per share, which would have amounted to a total authorized purchase of $175,000. Instead, on June 24, Wells purchased 4100 shares of CYBX at $46.99 per share, for a purchase price of $192,659, excluding commissions. Wells is liable to Wehrs for $17,659 for the first purchase of CYBX, which is the difference between the purchase authorized by Wehrs and the purchase Wells made.

12

Wells also charged Wehrs a commission of $2.33 per share when he executed the order. Wells is liable to Wehrs for an additional $233, which equals the portion of the commission that can be attributed to the 100 unauthorized shares.

Four days later, on June 27, 2005, Wells sold the stock at $44.33 per share, and Wehrs's account was credited $181,650, including a $100 commission charge. Wehrs's account suffered a loss of $20,565, which is equal to the amount charged to his account as a result of the purchase of CYBX ($202,215) minus the credit received from the sale ($181,650). Wells is not liable for the $100 commission for the June 27 sale. The undisputed facts show that the shares Wells was authorized to purchase would have been sold in any event, pursuant to the stop loss ordered by Wehrs. Furthermore, Wells only breached his duty to Wehrs to the extent that he allowed Wehrs's losses to exceed the $7,500 stop loss amount. Wells is liable for $12,965 with respect to the June 27 sale, which is equal to Wehrs's total loss ($20,565), credited $8,500 for the stop loss amount and sale commission.

On June 27, Wells repurchased 4100 shares of CYBX at the same price, $44.33 per share, for a total purchase price of $181,756, including what appears to be a $3 transaction fee. Wells charged Wehrs a commission of $2.19 per share for a total commission of $8,979. Wehrs's account was later credited for the full amount of this commission, and Wehrs concedes that Wells is not liable for the value of the commission.

As the value of CYBX declined, all but 85 shares were sold to repay the margin loan used to purchase the stock. Wehrs's account was credited $133,855 from the sales. Wehrs sold the last 85 shares for $1,398 in July 2009. Excluding commissions, Wehrs's account suffered a loss of $46,503 as a result of Wells's repurchase of the stock on June 27, which is the difference between the total purchase price and the total sale price ($181,756 - ($133,855 + $1,398)).

13

Wells argues that he is not liable for losses that occurred after June 27, 2005 because Wehrs failed to mitigate damages by selling the stock in a timely manner. *See, e.g.*, *McCurnin* v. *Kohlmeyer & Co.*, 347 F. Supp. 573, 579 (E.D. La. 1972) (customer had duty to minimize damages that resulted from unauthorized commodities purchase by liquidating his position). The duty to mitigate is an affirmative defense, which Wells waived when he failed to answer or otherwise plead to the complaint. *See Kensington Rock Island Ltd. P'Ship* v. *Am. Eagle Historic Partners*, 921 F.2d 122, 125 (7th Cir. 1990); Arthur R. Miller & Mary Kay Kane, 5 *Moore's Federal Practice* § 1278; 22 *Am. Jur. 2d Damages* § 698; Fed. R. Civ. P. 8(c). Wells also waived his right to assert the affirmative defense that Wehrs ratified the transaction by failing to direct him to sell the CYBX stock even after it was clear that Wells had made an unauthorized purchase. *See Restatement (Second) of Agency* § 416.

Taking the foregoing into account, the total loss that resulted from Wehrs's unauthorized actions amounts to $77,360. Wehrs agrees that Wells is entitled to a credit in the amount of $27,499 received from the settling defendants. *See Restatement (Second) of Torts* § 885(3). Therefore Wells is liable for $49,861.

**B.     Prejudgment Interest**

Wehrs argues that he is entitled to prejudgment interest at a rate of 5% per year pursuant to the Illinois Interest Act. *See* 815 Ill. Comp. Stat. § 205/2. The Interest Act does not provide for the award of prejudgment interest in negligence cases. *Westchester Fire Ins. Co.* v. *Gen. Star Indem. Co.*, 183 F.3d 578, 585 (7th Cir. 1999); *Wilson* v. *Cherry*, 612 N.E.2d 953, 958, 244 Ill. App. 3d 632, 184 Ill. Dec. 77 (1993). A court may, however, make an equitable award of prejudgment interest for breach of fiduciary duty. *Westchester Fire Ins.*, 183 F.3d at 585; *In re Estate of Wernick*, 535 N.E.2d 876, 888, 127 Ill. 2d 61, 129 Ill. Dec. 111 (1989). The rationale is

14

that a defendant who breached his fiduciary duty should not be able to retain the benefit he received, in the form of profits and interest, from wrongly obtained funds. *Wernick*, 535 N.E.2d at 888. Prejudgment interest is applied out of concern for fairness and equity rather than as a mechanism for penalizing the defendant for his conduct. *Id.* Courts awarding equitable prejudgment interest therefore look to the extent to which the wrongdoer benefitted from his breach of the applicable duty of care. *See*, *id.* at 888; *NC Ill. Trust Co.* v. *First Illini Bancorp, Inc.*, 752 N.E.2d 1167, 1178, 323 Ill. App. 3d 254, 256 Ill. Dec. 925 (2001); *In re Marriage of Pitulla*, 559 N.E.2d 819, 832, 202 Ill. App. 3d 103, 147 Ill. Dec. 479 (1990). Here, Wells received no financial benefit from his wrongdoing. He was removed from Wehrs's account and effectively prevented from taking any corrective action that might have been requested by Wehrs. Wehrs, on the other hand, chose to retain his investment long after it became clear that CYBX would not increase in price. Equity does not warrant the award of prejudgment interest in these circumstances.

## CONCLUSION AND ORDER

Wehrs's motion for summary judgment as to damages [#153] is granted. The Clerk is directed to enter judgment in favor of plaintiff and against defendant Wells in the amount of $49,861.00. Costs are allowed to the plaintiff. The claim for prejudgment interest is denied.

DATE: September 23, 2011  ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge